The last case on the calendar for today is Greenway II, LLC v. Wildenstein & Co., 22-1201CV. Mr. Portz. Pardon me. May it please the Court. The trial court below granted summary judgment to the defendant on three different grounds. We think the court below was wrong on each of those three grounds, and let me address them one at a time. First, the court found that our client, an unsophisticated art buyer, relatively new art buyer, was not allowed to rely justifiably on the words of Wildenstein & Co., one of the world's foremost art galleries for a century. The ruling on that issue, first of all, misstated a lot of the record. It misstated the role of the consultant, Mr. Moffitt, but the mere fact that he was there was sufficient for the trial court to find that he could have discovered the basis for the fraud claim that we bring here today, and therefore, they could not reasonably rely on Wildenstein, even though at the time, for 50 years before and now, Wildenstein was E.F. Hutton. People listen to what they say. Now, in finding that the mere fact that we had access to a consultant is dispositive of that issue, the court found as a fact that he was a respected curator, although there's no testimony about his reputation. They found that he issued a condition report when the fact is he commissioned somebody else to issue a condition report. He merely ordered it. They found that he was capable of advising his client on the disclosures that were made by Wildenstein and the authenticity of the work when there is no testimony that he read any of the disclosures, no testimony that he knew anything at all about authenticity, and in fact, in this context, authenticity of Impressionist artwork is a highly arcane, esoteric field, no testimony at all that he was remotely qualified to do that, or in the face of Wildenstein telling him over and over and over in orally and in writing and in a warranty that this was a genuine work of Pierre Bonnard, there's no reason for him to have had to jump through all those hoops. But didn't they also tell him and wasn't he informed that this particular work was not in the Bonnard catalogue? He absolutely was not informed that. If he had been, we'd be in an entirely different place. The basis for that actually goes to the next point on the 1985 fact sheet, but let me address it here. There was a fact sheet, it's page number 69 of the record, that discussed two different Bonnard paintings, one that he bought, one that he was never shown, that he never considered buying, that was not anything relevant to any of these discussions. The 1985 fact sheet said that the other one, Plate of Peaches in English, was listed in the catalogue and down below there's a reference to our work where it says nothing. The quote below said not only was Wildenstein not hiding the fact that it's not listed, it disclosed that it stated that the thing was not listed there and it just didn't do that. There's no definition of disclosure that would encompass what this fact sheet says. And, in fact, the burden to which the quote below put my client is a test that nobody would pass. Our client was effectively told that he had to have read the entire thing. When the testimony was he had no reason to read the part of the fact sheet about the painting he wasn't considering, he hadn't seen, that he should have noticed the distinction between those two paintings and he should have drawn from that that there was something significant about that difference that led to the probability of fraud. Could you talk about the subsequent appraisals? Because even if we agree with you that at the outset your client was not on notice of the likelihood that it was inauthentic because the catalogue resume was not listed for this particular painting whereas on that very same piece of paper it was listed for another one. But what do you do with the appraisals from Christie's and subsequent years where the appraisals note and there's virtually no text on this piece of paper. I mean, you can't miss it. I believe your client even said he did read it. Not included in currently accepted catalogue resume assumes that the recognized authority on the artist would confirm attribution. How did that, tell us why that does not put your client on notice that basically being in the catalogue resume is something that one ought to be in, that it's currently accepted because that's how it's described. It's currently accepted. And that there's merely an assumption that it would be, that the attribution would be confirmed which is another way of saying we don't know that this has been confirmed. Well, first of all, an assumption is not a bad thing. In the second place, the court found that to be a hint which under your jurisprudence just isn't enough. A hint. A hint. That's the word of the decision below. A hint and the sentence goes on to say that Christie's was not authenticating the work. Now that misapprehends the purpose of the appraisal in the first place. They're not there as authenticators. The question is whether it would put him on notice that he needs to inquire about this. That's the question. And it wouldn't. Let me tell you why. Even if a hint was sufficient, then of course it's not. This Court's jurisprudence and all of New York law going all the way back to Higgins and Crouch in 1895 says in effect that for someone to be on inquiry notice, you have to be told of something that A, contradicts something you've been told that lays bare, I think that's the language of the decision, lays bare the problem, and B, that points to the probability that you've been defrauded. In point of fact, the Court below misapprehended the role of the C, the catalogue raisonne in this discussion. It said the linchpin of our fraud case is that the work is not in the catalogue raisonne. And that's not what we say. We say the linchpin of our case is that it's a fake. And that the catalogue raisonne would have, excuse me, that Wildenstein would have known that, but we might not necessarily have done so ourselves. The question, I think, is given the assumption, and if Christie's had thought this work was a fake, they would have said it's not worth $4 million. They would have said it's a fake. It's not a question of whether Christie's thought it was a fake. My point... The question is whether that disclaimer put your client on notice that he needed to inquire. It doesn't point to A, the falsity of anything he'd been told before, and B, to the probability of fraud. So in your view, that language in the New York case is about the probability of fraud? Am I interpreting you correctly that you're suggesting that's basically more probable than not standard, as opposed to like a probable cause standard, meaning there's a pretty good chance? The case law uniformly uses the word probability. No, I know. Now I'm asking, how do you interpret the word probability is used in that? Certainly, at a minimum, more likely than not, and possibly something far greater. Remember that at the same time as those legends appeared, our client had in his mind at all times that he was still a customer of the world's most foremost gallery in such things, that nothing about this says this is a fake, and that in point of fact, the value went up from year to year to year to a multiple, I think, of 16 times. I think under the circumstances, even if it had put him on some notice, there's a real question as to what exactly would have happened next. If you called up Wildenstein and said, look at what's on this appraisal, I don't think they would have said, you got me, it's a fake. They would have said, don't worry about it. And they said, don't worry about it. They said it's likely to be attributed. But the question, Frank, is he would have had a duty of inquiry. So if you're saying that then it would have triggered him, had it triggered him to inquire, then the question would have been, well, what was the reasonableness of his inquiry, right? And then if he had engaged in reasonable inquiries, then he'd have no problem. But I don't think you can then say, you know, even assuming he had a duty to inquire, nothing would have turned up because Wildenstein would have lied. That doesn't seem to answer the question. We've kept you past your time. Why don't we hear from the other side? May I say one more thing before I sit down? If you want to use up some of your rebuttal time. Very well. Thank you, Judge. Either way. Okay. We're going to try to, we're running a little behind, so we're going to try to keep on track now. Mr. Schindler. Yes. Good morning, Your Honors, and may it please the Court. The Court should affirm the District Court's well-reasoned summary judgment dismissal of Appellant's fraud claim as both time-barred and for failure to demonstrate reasonable reliance as a matter of law. Appellant's fraud claim is based on the purchase of a painting that took place nearly 40 years ago. In June of 1985, Neal Wallace threw a trust bought from Wildenstein, a painting entitled Still Life with Basket of Fruit, which Wildenstein then attributed to the French Impressionist painting Pierre Bonnard. Thirty-four years later, Appellant brought this claim, alleging that Wildenstein's 1985 representation of authenticity was recklessly false. And the sole basis for Appellant's claim of recklessness is that Wildenstein purportedly failed to investigate the painting's disclosed absence from the Pierre Bonnard catalogue résumé. Appellant argues that the absence of the painting from the catalogue was a bright red flag of inauthenticity, but this purported lone red flag was no secret. As Your Honors pointed out, for decades, Appellants have had documents expressly referencing this very absence from the catalogue. The undisputed evidence establishes that Wildenstein provided Wallace and his art advisor sale documents in 1985 disclosing the painting's absence from the Bonnard catalogue résumé. And additionally, Wallace's appraiser, Christie's, provided him not one, but eight annual appraisal reports beginning in 2007. Each of which explicitly states that the painting was not included in the currently accepted catalogue résumé. And then as Judge McMahon goes on to say, not just that, even if you assume for some moment that a sophisticated buyer like Mr. Wallace wouldn't know by 2007 what a catalogue résumé was, the language in the appraisal assumes that the recognized authority on the artist would confirm attribution, suggesting that, of course, that they had not confirmed attribution. And the case law in this circuit is very clear. In the Anderson case, Dawes v. Cigna case, if a party has notice as documents that contains the very information that they now claim fraud based upon, they have a duty to inquire. They have a duty to investigate. Counsel, the painting went up in value with every time Christie looked at it. It went up in value, didn't it? What do you make of that? Of course, Christie's is not a defendant here. Right. So Mr. Wallace testified that he read these appraisal reports and that he just chose to focus on the fact that the paintings were going up in value. And indeed, you know, the appraisal report, the appraisal is based upon the assumption, as it states very clearly, that this work, which is not currently in the catalog resume, would be accepted into the catalog resume, would be attributed to Bonar. And so that is just like if you got an annual appraisal that said that your house was worth, say, $2 million, and the only thing on the appraisal was, you know, value $2 million, and then below it this assumes that you actually have valid title to your house. I mean, that would at least trigger, and again, the test here is an objective one. It doesn't really matter what was in Mr. Wallace's head when he received these notices. What would a reasonable person do of ordinary intelligence? And if I got an appraisal that said that my house was worth $2 million and it said right below it that assumes that you can show that you have title to it, I would make a phone call, at the very least make a phone call to Christie's and say, What do you mean by this? Why are, and this is not just once. It's every year. And Mr. Wallace, no question, looked at it and then testified, yeah, he wished he would have made that phone call. But he didn't. And so the law is that he's, the knowledge of whatever fraud may have existed was imputed to him at least by 2007, in which case the claim would have had to have been brought by 2009, and it wasn't. Any other questions, Your Honors? Thank you. Okay. Thank you. Thank you. Mr. Shinley, I'm sorry, Mr. Poritz, you've reserved two minutes for rebuttal. I did, Your Honor, and I'll try not to use all of it. Your Honor, if the case was we were told in 1985 that the work was in the catalogue raisonne, and we learned from an insurance appraisal that it wasn't 20 years later, that would be one thing, and that would fit fairly neatly within this Court's jurisprudence as to what you need to know to be placed by inquiriness. In 1985 it didn't say that it was in the catalogue raisonne, did it? It said it wasn't. It said it wasn't. Right. But my point is, I mean, your jurisprudence requires something that either lays bare the fraud and not being in the catalogue raisonne all by itself is not fraud. There are plenty of works that never got submitted to the catalogue that get submitted later on and accepted. So your case law says, and so does New York State's, that where there is a contradiction, where you're told one thing and you find out the opposite, that's inquiry notice. We were told not that the work, we were not told that the work was in the catalogue in 1985 and found out 20 years later that we'd been lied to. We were actually told nothing at all about it, except we were told it was authentic over and over and over in writing, in a warranty, and orally. So we don't have the kind of contradiction that your case law considers to be the hallmark of probability of a fraud. You would look at that thing and you'd say, well, maybe it's not in the catalogue, whatever that means. But you wouldn't look at that and say, aha, I've probably been defrauded. And Christie's, by the way, would have said in response to counsel's point, we were hired just to do insurance appraisals. We're not authenticators. That's not what we're here for. We're not anything other than telling you what this is worth for insurance purposes. And every year it went up $275,000 in 1985, $4.5 million at the end. That's a pretty good indication that this is a genuine work combined with the fact that the voice of the deity itself repeatedly and in warranty form advised Mr. Wallace of its genuineness. There's no reason why he should not have believed them, and there's no reason why that insurance appraisal should have made him disbelieve it in light of the reputation of the people, the language of the appraisals itself, and the 16-fold increase in value that Christie's each and every one of those years was telling him. Thank you. Thank you very much. Thanks to both of you. We appreciate the argument. It's very helpful. We have now completed the calendar. We're taking this as all other cases under advisement, and we will now stand adjourned. Thank you, Your Honor. Thank you. Court is adjourned.